Slip Op. 17-90

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **KYOCERA SOLAR, INC. and KYOCERA MEXICANA S.A. de C.V.,** | |
| Plaintiffs, | |
| v. | |
| **UNITED STATES,** | Before: Claire R. Kelly, Judge |
| Defendant, | Court No. 15-00081[1] |
| and | |
| **SOLARWORLD AMERICAS, INC.,** | |
| Defendant-Intervenor. | |

## <u>OPINION</u>

[Sustaining the Department of Commerce's remand determination in the antidumping investigation of certain crystalline silicon photovoltaic products from Taiwan.]

Dated: July 21, 2017

---

[1] Plaintiffs Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V initiated the present case on March 20, 2015. Summons, Mar. 20, 2015, ECF No. 1, Court No. 15-00081. On July 1, 2015, Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V. v. United States, Court No. 15-00081, was consolidated under SunEdison, Inc. v. United States, Consol. Court No. 15-00066. See Order, July 1, 2015, ECF No. 21, Court Nos. 15-00066 & 15-00081. The previous opinion in these proceedings, ordering remand to the Department of Commerce, was accordingly published under SunEdison, Inc. v. United States, Consol. Court No. 15-00066 on June 14, 2016. See SunEdison, Inc. v. United States, 39 CIT __, 179 F. Supp. 3d 1309 (2016). Subsequently, on April 20, 2017, SunEdison, Inc., original Plaintiff in SunEdison, Inc. v. United States, Court No. 15-00066, filed a stipulation of dismissal. Stipulation of Dismissal, Apr. 20, 2017, ECF No. 93, Court No. 15-00066. On April 21, 2017, SunEdison, Inc. v. United States, Court No. 15-00066, and Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V. v. United States, Court No. 15-00081, were severed and deconsolidated; SunEdison, Inc. v. United States, Court No. 15-00066, was dismissed with prejudice; and Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V. v. United States, Court No. 15-00081, was reinstated. Order, Apr. 21, 2017, ECF No. 94.

J. Kevin Horgan, deKieffer & Horgan, PLLC, of Washington, DC, argued for plaintiffs Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V.  With him on the brief was Alexandra H. Salzman.

Joshua E. Kurland and Agatha Koprowski, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for the defendant. With them on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel was Scott McBride, Assistant Chief Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Timothy C. Brightbill, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor SolarWorld Americas, Inc.  With him on the brief was Laura El-Sabaawi.

Kelly, Judge:  Before the court for review is the U.S. Department of Commerce's ("Commerce" or "Department") remand determination in the antidumping investigation of certain crystalline silicon photovoltaic products from Taiwan, filed pursuant to the court's order in SunEdison, Inc. v. United States, 40 CIT __, 179 F. Supp. 3d 1309 (2016).[2]  See Final Results of Redetermination Pursuant to Court Order, Oct. 5, 2016, ECF No. 75-1[3] ("Solar II Taiwan Remand Results").  For the reasons set forth below, the court sustains Commerce's redetermination because Commerce has complied with the court's order in

---

[2] This consolidated action was originally assigned to Judge Donald C. Pogue, who remanded in SunEdison on June 14, 2016.  See SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1312, 1326.  On November 18, 2016, pursuant to USCIT Rule 77(e)(4) and 28 U.S.C. § 253(c) (2012), the case was reassigned following Judge Pogue's death.  Order of Reassignment, Court No. 15-00066, Nov. 18, 2016, ECF No. 80.  Oral argument was held on April 28, 2017.  See Oral Arg., Consol. Court No. 15-00081, Apr. 28, 2017, ECF No. 26.

[3] All docketed documents cited in this opinion that were filed prior to April 21, 2017 are located on the docket of SunEdison, Inc. v. United States, Court No. 15-00066, and the cites provided are to that docket.  See Order, Apr. 21, 2017, ECF No. 94 (ordering all documents filed on the docket of SunEdison, Inc. v. United States, Court No. 15-00066 that are pertinent to Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V. v. United States, Court No. 15-00081, incorporated by reference to the docket of Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V. v. United States, Court No. 15-00081).  All docketed documents cited in this opinion that were filed after April 21, 2017 are located on the docket of Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V. v. United States, Court No. 15-00081, and the cites provided are to that docket.

SunEdison, 40 CIT __, 179 F. Supp. 3d 1309, and Commerce's conclusions are

supported by substantial evidence.

## BACKGROUND

The court assumes familiarity with the facts of this case as discussed in the

previous opinion, see SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1312–16, and here

recounts the facts relevant to the court's review of the Solar II Taiwan Remand Results.

This case concerns an antidumping duty ("ADD") investigation of certain solar products

from Taiwan which is intrinsically related to two sets of ADD and countervailing duty

("CVD") investigations covering certain solar products from the People's Republic of

China ("China" or "PRC").  An overview of all three sets of investigations[4] is warranted to

contextualize the current proceeding.

Initially, Commerce investigated the solar industry in China on the basis of a

petition from domestic producer SolarWorld Americas, Inc. ("SolarWorld"), Defendant-

Intervenor here, alleging dumping activity and countervailable subsidies injurious to the

domestic solar industry ("the Solar I PRC investigations").  Crystalline Silicon Photovoltaic

Cells, Whether or Not Assembled Into Modules, From the People's Republic of China, 76

Fed. Reg. 70,960 (Dep't Commerce Nov. 16, 2011) (initiation of ADD investigation);

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the

People's Republic of China, 76 Fed. Reg. 70,966, 70,967 (Dep't Commerce Nov. 16,

2011) (initiation of CVD investigation).  The Solar I PRC investigations resulted in ADD

and CVD orders covering crystalline silicon photovoltaic cells ("solar cells" or "cells") from

---

[4] For clarification, the three sets of investigations are: i) the Solar I PRC ADD and CVD
investigations; ii) the Solar II PRC ADD and CVD investigations; and iii) the Solar II Taiwan ADD
investigation.

China, including Chinese cells assembled into modules, laminates, and panels outside of

China ("the Solar I PRC Orders"); these orders did not cover solar modules, laminates, or

panels assembled in China using solar cells produced outside of China. See Crystalline

Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's

Republic of China, 77 Fed. Reg. 73,018 (Dep't Commerce Dec. 7, 2012) (amended final

determination of sales at less than fair value and ADD order); Crystalline Silicon

Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic

of China, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012) (CVD order) ("the Solar I

PRC Orders").  Although the Solar I PRC Orders covered both solar cells and modules,

laminates, and/or panels containing solar cells, Commerce determined that the solar cell

is the origin-conferring component.  See Issues and Decision Mem. for the Final

Determination in the [ADD] Investigation of Crystalline Silicon Photovoltaic Cells, Whether

or Not Assembled into Modules, from the [PRC], A-570-979, 5–9 (Oct. 9, 2012), available

at  http://ia.ita.doc.gov/frn/summary/prc/2012-25580-1.pdf  (last visited July 12, 2017)

("Solar I PRC ADD Final Decision Memo"); Issues and Decision Mem. for the Final

Determination in the [CVD] Investigation of Crystalline Silicon Photovoltaic Cells, Whether

or Not Assembled Into Modules, from the [PRC], C-570-980, 77–81 (Oct. 9, 2012),

available at http://ia.ita.doc.gov/frn/summary/prc/2012-25564-1.pdf (last visited July 12,

2017) ("Solar I PRC CVD Final Decision Memo").   Further, using a substantial

transformation analysis, Commerce determined that assembly of solar cells into modules,

laminates, and/or panels in a third country did not change the country of origin of the

merchandise.[5]  Solar I PRC ADD Final Decision Memo at 5–6; Solar I PRC CVD Final

Decision Memo at 77–78.  Thus, solar modules, laminates, and panels assembled in a

third country using Chinese solar cells are covered by the Solar I PRC Orders, while solar

modules, laminates, and panels assembled in the PRC using non-Chinese solar cells are

not covered.  See Solar I PRC Orders.

Subsequently, SolarWorld petitioned Commerce to initiate additional proceedings

related to the Chinese and Taiwanese solar industries.  Pet. for Imposition of [ADD] and

[CVD] Investigation, Certain Crystalline Silicon Photovoltaic Products from the [PRC] and

Taiwan, PD 1–8, bar codes 3171322-01–08 (Dec. 31, 2013) ("Solar II PRC and Taiwan

Petition").[6]  SolarWorld claimed ongoing injury to the domestic solar industry, alleging

that the Chinese solar industry had, in response to the Solar I PRC Orders, shifted from

the assembly of modules, laminates, and panels (or "panels") using Chinese cells to the

assembly of panels in China using non-Chinese cells and to the manufacture of cells and

---

[5] Commerce applied a "substantial transformation analysis" in the Solar I PRC investigations to ascertain the origin of the solar panels.  Using this analysis,

> the Department found that solar cells are the "essential active component" that define the module/panel and that stringing third- country solar cells together and assembling them with other components into a module in the PRC does not constitute substantial transformation such that the assembled module could be considered a product of the PRC.

Solar I PRC ADD Final Decision Memo at 6; Solar I PRC CVD Final Decision Memo at 77–78.  In its substantial transformation analysis, Commerce considers: 1) whether the processed downstream product falls into a different class or kind of product when compared to the upstream product, 2) whether the essential component of the merchandise is substantially transformed in the country of exportation, and 3) the extent of processing.  See, e.g., Certain Crystalline Silicon Photovoltaic Products from Taiwan: Issues and Decision Mem. for the Final Determination of Sales at Less than Fair Value, A-583-853, 19 (Dec. 15, 2014), ECF No. 23-2.

[6] On July 2, 2015, Defendant submitted indices to the public and confidential administrative records, which identify the documents that comprise the public and confidential administrative records to Commerce's final determination.  The indices to these administrative records can be located at ECF No. 22, on the docket of SunEdison, Inc. v. United States, Court No. 15-00066. All further references to documents from the administrative records are identified by the numbers assigned by Commerce in these administrative records.

assembly of panels in Taiwan.[7]  Id. at 3–6 (stating that the Solar I PRC Orders "failed to cover Chinese solar modules assembled from non-Chinese solar cells, allowing Chinese solar producers to begin using cells fully or partially manufactured in Taiwan in the modules they assembled for export to the United States, and to export those modules, duty-free, to the U.S. market.").  At the same time, the petition alleges that imports of solar cells and panels from Taiwan increased as well, causing material injury to the domestic industry.  See id. at 2–7.  On the basis of this petition, Commerce initiated a second ADD and CVD investigation of the Chinese solar industry and an ADD investigation of the Taiwanese solar industry.  Certain Crystalline Silicon Photovoltaic Products from the [PRC] and Taiwan, 79 Fed. Reg. 4,661 (Dep't Commerce Jan. 29, 2014) (initiation of ADD investigations) ("Solar II PRC and Taiwan ADD Initiation Notice"); Certain Crystalline Silicon Photovoltaic Products from the [PRC], 79 Fed. Reg. 4,667 (Dep't Commerce Jan. 29, 2014) (initiation of CVD investigation) ("Solar II PRC CVD Initiation Notice").

These investigations resulted in two sets of orders.  The investigation into the Chinese solar industry resulted in an ADD order and a CVD order covering modules, laminates, and/or panels assembled in China consisting of cells manufactured outside of China, including cells manufactured in Taiwan.  Certain Crystalline Silicon Photovoltaic Products from the [PRC], 80 Fed. Reg. 8,592 (Dep't Commerce Feb. 18, 2015) (ADD order; and amended final affirmative CVD determination and CVD order) ("the Solar II

---

[7] Petitioners SolarWorld, Defendant-Intervenors here, alleged that, following issuance of the Solar I Order, Chinese companies began exporting solar panels to the United States that were assembled in China using solar cells "completed or partially manufactured in Taiwan or other countries," rather than using cells manufactured in China, as had been done prior to the Solar I Order.  Solar II PRC and Taiwan Petition at 5–6.

PRC Orders").[8]  The investigation into the Taiwanese solar industry resulted in an ADD

order covering solar cells manufactured in Taiwan,[9] including Taiwanese cells assembled

into modules, laminates, and/or panels outside of Taiwan, but excluding Taiwanese cells

assembled into modules, laminates, and/or panels in China covered by the Solar II PRC

Orders.  Certain Crystalline Silicon Photovoltaic Products from Taiwan, 80 Fed. Reg.

8,596 (Dep't Commerce Feb. 18, 2015) (ADD order) ("the Solar II Taiwan Order").[10]

The Solar II Taiwan Order is at issue in this case.  The petition alleged injury to the

domestic industry from imports of certain solar products from Taiwan, Solar II PRC and

Taiwan Petition at 5–6, and the Solar II Initiation Notice indicated that the investigation

would cover:

> [C]rystalline silicon photovoltaic cells, and modules, laminates and/or
> panels consisting of crystalline silicon photovoltaic cells, whether or not
> partially or fully assembled into other products, including building integrated
> materials. For purposes of these investigations, subject merchandise also

---

[8] The Solar II PRC Orders are the subject of litigation as well.  See SunPower Corp. v. United States, 40 CIT __, 179 F. Supp. 3d 1286 (2016); SunPower Corp. v. United States, 41 CIT __, Slip Op. 17-__ (July __, 2017). SunEdison linked these cases:

> Because the final Solar II Taiwan scope incorporates the Solar II PRC exception
> for solar panels assembled in China–which exempts all such panels from the
> otherwise generally applicable rule that the origin of solar panels is determined by
> the origin of their constituent cells–these same concerns are also implicated here.
> Accordingly, Commerce's final Solar II Taiwan scope determination must be
> remanded for the same reasons as those elaborated in the court's prior opinion, to
> ensure that the agency's approach in these proceedings is consistent.

SunEdison, Inc., 40 CIT at __, 179 F. Supp. 3d at 1321–22.

[9] Petitioner did not file a CVD petition with respect to subject imports from Taiwan.  Solar II PRC and Taiwan Petition at 19.

[10] Therefore, although the Solar I PRC Orders, Solar II PRC Orders, and Solar II Taiwan Order resulted from three separate sets of investigations, they are intrinsically related.  The Solar II PRC Orders cover Chinese-assembled modules, laminates, and panels consisting of cells from any country but China.  The Solar II Taiwan Order, on the other hand, parallels the Solar I PRC Orders, focusing on the location of the cells' manufacture; however, the Solar II Taiwan Order excludes Taiwanese cells assembled into panels in China, as those panels are within the scope of the Solar II PRC Orders.

includes modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.

. . . .

Also excluded from the scope of these investigations are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China. [See Solar I PRC Order].

See Solar II PRC and Taiwan ADD Initiation Notice, 79 Fed. Reg. at 4,667. Panels assembled in third-countries using Taiwanese cells were not explicitly included or excluded in the scope of the investigation at the outset of the investigation. However, as noted above, at this stage of the proceeding the scope language included what the parties refer to as the "two-out-of-three rule," providing that modules, laminates, and/or panels assembled in Taiwan using third-country cells comprised of Taiwanese ingots or Taiwanese wafers, and cells that were partially manufactured in Taiwan, were included as subject merchandise.[11]

---

[11] The "two-out-of-three rule" refers to the scope language providing that subject merchandise includes modules, laminates, and/or panels assembled in Taiwan using third-country cells comprised of Taiwanese ingots or Taiwanese wafers, and cells that were at least partially manufactured in Taiwan. Solar II PRC and Taiwan ADD Initiation Notice, 79 Fed. Reg. at 4,667 ("modules, laminates and/or panels assembled in the subject country consisting of crystalline silicon photovoltaic cells that are completed or partially manufactured within a customs territory other than that subject country, using ingots that are manufactured in the subject country, wafers that are manufactured in the subject country, or cells where the manufacturing process begins in the subject country and is completed in a non-subject country.").

The preliminary determination was published on July 31, 2014. Certain Crystalline Silicon Photovoltaic Products from Taiwan, 79 Fed. Reg. 44,395 (Dep't Commerce July 31, 2014) (affirmative preliminary determination of sales at less than fair value and postponement of final determination) ("Prelim. Results") and accompanying Decision Mem. for the Prelim. Determination in the [ADD] Investigation: Certain Crystalline Silicon Photovoltaic Products from Taiwan, A-583-853, (July 24, 2014), available at http://ia.ita.doc.gov/frn/summary/taiwan/2014-

(footnote continued)

Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V. (collectively "Kyocera") are affiliated entities within the Kyocera Corporation, "one of the world's largest vertically-integrated producers and suppliers of solar energy modules."  Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V. Mem. Supp. Mot. J. Agency R. 3, Nov. 4, 2015, ECF No. 30 ("Kyocera 56.2 Br.").   Kyocera Solar, Inc. is a U.S. importer of solar panels, headquartered in the United States, and Kyocera Mexicana S.A. de C.V. is a Mexico-based foreign manufacturer of solar panels, which it assembles at its plant in Mexico using solar cells manufactured in other countries, including Taiwan. See id. at 3–5.  On September 15, 2014, Kyocera requested Commerce to clarify the scope of the investigation and to find Kyocera's solar panels assembled in Mexico using Taiwanese cells outside the scope of the investigation.[12]  Certain Crystalline Silicon Photovoltaic Products from Taiwan: Request for Scope Determination re Solar Products from Mexico, PD 337, bar code 3228306-01 (Sept. 15, 2014).  Kyocera did not receive a response from Commerce to this scope ruling request.  See Kyocera 56.2 Br. 24.

---

18055-1.pdf (last visited July 18, 2017) ("Prelim. Decision Memo").  It maintained the "two-out-of-three rule."  See Prelim. Results, 79 Fed. Reg. at 44,395; Prelim. Decision Memo at 4–5. Commerce selected Gintech Energy Corporation and Motech Industries, Inc. as mandatory respondents, two Taiwanese companies producing/exporting subject merchandise.  See Prelim. Results, 79 Fed. Reg. at 44,395–96; Prelim. Decision Memo at 2.

[12] Kyocera states that it filed the scope ruling request after CBP requested that the company deposit estimated antidumping duties on certain of its solar panel imports from Mexico; Kyocera states that this was the first indication it had that its solar panels assembled in Mexico using Taiwanese cells would come within the scope of this investigation.  See Kyocera 56.2 Mot. 23–24.

On October 3, 2014, Commerce notified interested parties of a proposed revision of the scope language, seeking comment on the same.[13] [ADD] and [CVD] Investigations of Certain Crystalline Silicon Photovoltaic Products from the [PRC] and the [ADD] Investigation of Certain Crystalline Silicon Photovoltaic Products from Taiwan: Opportunity to Submit Scope Comments, PD 348, bar code 3233175-01 (Oct. 3, 2014) ("Scope Revision Notice Letter").  The scope revision was made to address concerns about the administration and enforcement of the "two-out-of-three rule."[14]  See id. at 1. The revision altered the scope to explicitly cover modules, laminates, and/or panels assembled in a third country, other than China, using solar cells produced in Taiwan.  Id. at 1–2.

---

[13] Kyocera was among the interested parties to submit scope comments in response to Commerce's October 3, 2014 letter.  See Certain Crystalline Silicon Photovoltaic Products from Taiwan: Case Brief, PD 361, bar code 3235607-01 (Oct. 16, 2014); Certain Crystalline Silicon Photovoltaic Products from Taiwan: Rebuttal Brief, PD 380, bar code 3237704-01 (Oct. 27, 2014).

[14] Commerce explained the administration and enforcement concerns with the "two-out-of-three rule":

> the Department found that the two-out-of-three scope language originally proposed by Petitioner would not be administrable, given that certain parties reported that they did not track where the ingots, wafers, or partial cells used in third-country cells being assembled into modules in the PRC were produced, and that it would be "virtually impossible" for importers to have that information. Additionally, in light of the history of evasion under the Solar I PRC Orders and the undisputed "complex and readily adaptable global supply chain," the Department found that the two-out-of-three scope language would permit further evasion and ultimately incomplete relief.

Solar II Taiwan Remand Results at 24–25 (quoting Certain Crystalline Silicon Photovoltaic Products from the [PRC]: Issues and Decision Mem. for the Final Determination of Sales at Less than Fair Value, A-570-010, 13, 14, n.45 (Dec. 15, 2014), available at http://ia.ita.doc.gov/frn/summary/prc/2014-30092-1.pdf (last visited July 14, 2017); Issues and Decision Mem. for the Final Determination in the [CVD] Investigation of Certain Crystalline Silicon Photovoltaic Products from the [PRC], C-570-011, 38, 40, n.215 (Dec. 15, 2014), available at http://ia.ita.doc.gov/frn/summary/prc/2014-30071-1.pdf (last visited July 14, 2017)).

On December 23, 2014, Commerce published the final determination in the Solar II Taiwan investigation.  Certain Crystalline Silicon Photovoltaic Products from Taiwan, 79 Fed. Reg. 76,966 (Dep't Commerce Dec. 23, 2014) (final determination of sales at less than fair value) and accompanying Issues and Decision Mem. for the Final Determination of Sales at Less than Fair Value, A-583-853, (Dec. 15, 2014), ECF No. 23-2 ("Solar II Taiwan Final Decision Memo").  Commerce implemented the revised scope language from the October 3, 2014 Scope Revision Notice Letter, removing the "two-out-of-three rule" and modifying the scope language to explicitly cover all modules, laminates, and/or panels assembled in a third-country using Taiwanese cells:

> The merchandise covered by this investigation is crystalline silicon photovoltaic cells, and modules, laminates and/or panels consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including building integrated materials.
>           . . .
> Modules, laminates, and panels produced in a third-country from cells produced in Taiwan are covered by this investigation. However, modules, laminates, and panels produced in Taiwan from cells produced in a third-country are not covered by this investigation.
>           . . .
> Further, also excluded from the scope of this investigation are any products covered by the existing antidumping and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the [PRC].  Also excluded from the scope of this investigation are modules, laminates, and panels produced in the PRC from crystalline silicon photovoltaic cells produced in Taiwan that are covered by an existing proceeding on such modules, laminates, and panels from the PRC.

Solar II Taiwan Final Decision Memo at 4–5.  Commerce determined that, for purposes of this investigation, country of origin would be determined by the location of manufacture of the solar cell and applied a substantial transformation test, as it did in the Solar I PRC investigations, to determine that solar cells from Taiwan are not substantially transformed when assembled into modules, laminates, or panels.  Id. at 18–21.  Accordingly,

Commerce determined that Kyocera's solar panels assembled in Mexico using Taiwanese cells are within the scope of the final order. Id. at 23–24.

On November 4, 2015, Kyocera moved for judgment on the agency record. See Consolidated Pls. Kyocera Solar, Inc., and Kyocera Mexicana S.A. de C.V.'s Mot. J. Agency R., Nov. 4, 2015, ECF No. 28. Kyocera challenged four aspects of Commerce's final affirmative determination in the investigation, relevant to Kyocera's imports of solar panels from Mexico. See Kyocera 56.2 Br. at 11–26. Specifically, Kyocera challenged Commerce's determinations: 1) that Taiwanese solar cells assembled into solar modules in Mexico are within the scope of the Solar II Taiwan Order, absent a finding of circumvention, id. at 11–18; 2) that Taiwanese solar cells assembled into panels in Mexico are not substantially transformed into a new and different article of commerce, id. at 18–23; 3) to alter the language describing the scope of the merchandise under investigation in its final determination, "retroactively enlarg[ing] the scope of the investigation in a manner that unlawfully compromised the ability of interested parties to participate in the antidumping investigation conducted by the Department," id. at 23–25; and 4) to assess antidumping duties based on the full value of the finished product—solar panels, modules, and laminates produced in Mexico—when only the solar cell is from Taiwan, the subject country. Id. at 25–26.

On June 14, 2016, the court remanded the final determination in the Solar II Taiwan investigation to Commerce "for consistency with, and based on the same reasoning as" its remand order in the litigation concerning the Solar II PRC investigation. SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1312. The court stated that the issues in the two cases are "inextricably entwined" because both "concern the rules of origin for solar panels

manufactured from Taiwanese cells."  Id., 40 CIT at __, 179 F. Supp. 3d at 1312–13; see

SunPower, Corp. v. United States, 40 CIT __, __, 179 F. Supp. 1286, 1298–1308 (2016)

("SunPower").  In SunEdison, the court sustained several of Commerce's determinations,

and remanded or deferred determination on issues related to scope for consistency with

SunPower.[15]  See SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1317–27.

---

[15] In SunEdison the court:

1)  sustained Commerce's determinations that:

   (a) solar cells are not substantially transformed when assembled into modules, laminates,
   or panels, bringing Taiwanese solar cells assembled into panels in Mexico within scope
   of the Solar II Taiwan Order, SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1322–24;

   (b) the Solar II Taiwan scope was not contrary to 19 U.S.C. §1673, 19 U.S.C.
   § 1677j(b), or 19 C.F.R. § 351.225(h), id., 40 CIT at __, 179 F. Supp. 3d at 1318–20; and

   (c) it was not required to use a substantial transformation test to determine origin in all
   instances, id., 40 CIT at __, 179 F. Supp. 3d at 1320;

2) remanded

   (a) the scope determination for consistency with SunPower, requesting that Commerce
   explain whether: (i) it established two origin rules for products within a single class or kind
   of merchandise; (ii) it treated similarly-situated products differently; and (iii) it departed
   from prior practice by calculating normal value of panels assembled in China based on
   Chinese prices, rather than on prices in the market of cell production, id., 40 CIT at __,
   179 F. Supp. 3d at 1321–22; and

   (b) for further consideration and explanation its decision to base duty assessments on the
   full value of solar panels assembled in a third country from Taiwanese cells, id., 40 CIT at
   __, 179 F. Supp. 3d at 1324–27;

3) deferred decisions on whether

   (a) Commerce lacks authority to alter the scope during the investigation, resulting here in
   alleged "incongruence between the sales used to determine dumping liability and those
   ultimately covered by the order," id., 40 CIT at __, 179 F. Supp. 3d at 1317–18;

   (b) 19 U.S.C. §§ 1677b(a) and 1677(16)(A)–(C) require a uniform test to determine when
   the foreign like product is "produced in the same country" as subject merchandise, id., 40
   CIT at __, 179 F. Supp. 3d at 1319;

   (c) whether Kyocera as a third-country panel assembler was unlawfully deprived of the
   right to participate in the investigation, id., 40 CIT at __, 179 F. Supp. 3d at 1317; and

(footnote continued)

Commerce published the Solar II Taiwan Remand Results on October 5, 2016. On remand, as requested by the court, Commerce provided explanation of its determinations in the Solar II PRC and Solar II Taiwan investigations. See Solar II Taiwan Remand Results at 2–33. Commerce explained that it has the authority to modify the scope language from the initiation of the investigation to the issuance of the ADD or CVD order, see id. at 12–18, and that "[t]he class or kind of merchandise defined in a petition may not be exactly the same class or kind of merchandise ultimately subject to a countervailing or antidumping duty order." Id. at 13. Commerce explained that it applied a substantial transformation test in the Solar II Taiwan investigation, in which it determined that cells are not substantially transformed by the process of panel assembly and thus that the cell is origin-conferring, but that, due to the specific pricing behaviors and subsidization in the Solar II PRC investigations, Commerce applied a different origin rule for purposes of the Solar II PRC investigations. Id. at 23–28. Commerce also explained that Taiwanese cells assembled into panels in Taiwan are excluded from the Solar II Taiwan Order, to avoid subjecting a product to two orders. Id. at 21–22.

---

(d) whether Commerce may exclude third-country sales that mandatory respondents reported as destined for the United States, id., 40 CIT at __, 179 F. Supp. 3d. at 1327; and

4) determined Kyocera's due process argument regarding the scope determination was moot, id., 40 CIT at __, 179 F. Supp. 3d at 1317.

The deferred issues regarding whether 19 U.S.C. §§ 1677b(a) and 1677(16)(A)–(C) require a uniform test to determine when the foreign like product is "produced in the same country" as subject merchandise and whether Commerce may exclude third-country sales that mandatory respondents reported as destined for the United States were arguments raised only by former Plaintiff SunEdison, Inc. See id., 40 CIT at __, 179 F. Supp. 3d at 1319, 1327. Because SunEdison, Inc. has since been dismissed from the case, see Order, Apr. 21, 2017, ECF No. 94, these issues are no longer in the case so the court does not reach these issues here.

Kyocera challenges the Solar II Taiwan Remand Results on the grounds that Commerce impermissibly applied two origin rules within the same order.  <u>See</u> Kyocera Solar, Inc. and Kyocera Mexicana S.A. de C.V. Comments on Remand Determination 3–5, Oct. 28, 2016, ECF No. 77 ("Kyocera Remand Comments").

## STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012)[16] and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of a countervailing duty order.  "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'"  <u>Xinjiamei Furniture (Zhangzhou) Co. v. United States</u>, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting <u>Nakornthai Strip Mill Public Co. v. United States</u>, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

In <u>SunEdison</u>, the court remanded to Commerce for further consideration and explanation of: (1) Commerce's apparent departure from its prior practice of using a single country of origin test for a particular class or kind of merchandise; (2) Commerce's dissimilar treatment of similarly situated merchandise; and (3) Commerce's departure

---

[16] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

from its prior practice of calculating normal value using the market where the majority of production of the subject merchandise took place. SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1321–22. The court remanded for further explanation or reconsideration regarding Commerce's decision to base duty assessments on the full value of solar panels assembled in a third country from Taiwanese cells. Id., 40 CIT at __, 179 F. Supp. 3d at 1324–27. The court deferred consideration of the arguments that Commerce "unlawfully altered the sales databases relied on throughout the investigation, resulting in incongruence between different sales used to determine dumping liability and those ultimately covered by the order," id., 40 CIT at __, 179 F. Supp. 3d at 1317–18, and that the alteration of the scope in the final determination deprived Kyocera and other third-country producers of a right to participate in the investigation. Id.[17] The remanded and deferred issues are addressed in turn.

## I. Remanded Issues

In SunEdison, the court remanded the final scope determination in the Taiwan investigation for consistency with SunPower because the scope of the Solar II Taiwan Order incorporates the Solar II PRC Orders' exception for solar panels assembled in China, and because of the court's concern that the orders had conflicting rules of origin. SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1321–22; see SunPower, 40 CIT at __, 179 F. Supp. 3d at 1298–1308. More specifically, the court in SunEdison asked Commerce to further consider or explain: (1) whether Commerce had departed from its prior practice

---

[17] SunEdison determined that Kyocera's "due process challenges to the final scope determination are moot," because Kyocera would "have ample opportunity to address the scope issues on remand." SunEdison, 40 CIT __, 179 F. Supp. 3d at 1317. The court nonetheless deferred Kyocera's argument that it was deprived of its right to participate in the proceedings as a respondent and to submit factual information. Id.

of using a single rule of origin for a class or kind of merchandise; (2) whether Commerce treated similarly situated merchandise dissimilarly; and (3) whether Commerce had departed from its prior practice of calculating normal value "in the market where the majority of production of the subject merchandise took place." SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1321.  The court also sought further explanation or reconsideration from Commerce regarding its decision to base duty assessments on the full value of solar panels assembled in third countries from Taiwanese solar cells. Id., 40 CIT at __, 179 F. Supp. 3d at 1324–27.

### A. The Class or Kind of Merchandise

In SunEdison, the court referenced its decision in SunPower and remanded to Commerce to explain its deviation from its prior policy of applying only one rule of origin to a single class or kind of merchandise, based on the court's assumption that all solar panels were a single class or kind of merchandise.[18]  SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1321–22; see SunPower, 40 CIT at __, 179 F. Supp. 3d at 1298–1308.

---

[18] In SunPower the court found that "Commerce provides two separate grounds for this determination [to apply a different rule of origin in Solar II PRC]: (1) addressing circumvention of the Solar I PRC orders; and (2) addressing assembly-specific Chinese government subsidies. Neither is sufficient." SunPower, 40 CIT at __, 179 F. Supp. 3d at 1304.  The court went on to state that

> Commerce does not explain why either of its rationales provides a sufficient basis for disregarding Commerce's prior factual findings regarding the relative insignificance of panel assembly in determining country-of-origin.  Nor does Commerce explain why either ground provides a sufficient basis for applying AD[D]/CVD duties to the entire value of panels that are assembled in China from non-Chinese cells, thereby failing to consider and explain an important aspect of the problem.

Id.

On remand, Commerce explained its use of different origin rules in the Solar II PRC and Solar II Taiwan investigations. See Solar II Taiwan Remand Results at 12–28. Commerce stated that, contrary to the court's assumption, the Solar II PRC Orders and Solar II Taiwan Order (as well as the Solar I PRC Orders) covered different classes or kinds of merchandise.[19]   Solar II Taiwan Remand Results at 16–18.   Therefore, Commerce did not apply different origin rules to the same class or kind of merchandise; it applied different origin rules to different classes or kinds of merchandise. See id. at 22–23, 27–28. For the reasons that follow, on remand Commerce has sufficiently explained that its country-of-origin analyses in Solar II PRC and Solar II Taiwan do not constitute application of two rules of origin to a single class or kind of merchandise.

The statute and case law instruct that the term "class or kind of merchandise" refers to the products within a particular proceeding.   The term "subject merchandise" is statutorily defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921."   19 U.S.C.

---

[19] In SunPower the court questioned the application of different origin rules to what it assumed were products within the same class or kind of merchandise:

> In Solar I PRC, Commerce covered all solar cells produced in China and assembled into panels anywhere in the world, including China, as merchandise from China.  Then in Solar II PRC, Commerce covered, also as merchandise from China, all panels assembled in China from cells produced anywhere in the world, other than China.  To do this, Commerce established two different rules of origin for solar panels, depending on where they were assembled.  For solar panels assembled anywhere other than China, origin is the country of cell-production.

SunPower, 40 CIT at __, 179 F. Supp. 3d at 1298–99, 1303.  Throughout the SunPower opinion, the court assumed that all solar panels are products within a single class or kind of merchandise. See, e.g., 40 CIT at __, 179 F. Supp. 3d at 1299 ("[I]t appears unprecedented for Commerce to apply more than one country-of-origin determinative rule to products within the same class or kind of merchandise."), 1303 ("Commerce has nonetheless applied two different rules to similarly situated products within the same class or kind of merchandise.").

§ 1677(25).  This definition of subject merchandise demonstrates that the scope of a proceeding establishes the "class or kind of merchandise."  Because the statute refers to the "class or kind of merchandise" that is within the scope, one must look to the scope itself to find the parameters of the "class or kind of merchandise."  Precedent from the Court of Appeals for the Federal Circuit supports an interpretation of "class or kind of merchandise" as proceeding-specific.  See Target Corp. v. United States, 609 F.3d 1352, 1363 (Fed. Cir. 2010) (noting, in the context of later-developed goods not specifically excluded in the order, that "[t]he kind or class of merchandise encompassed by a final antidumping order is determined by the order," citing Smith Corona Corp. v. United States, 915 F.2d 683, 685 (Fed. Cir. 1990) (explaining that "[t]he class or kind of merchandise encompassed by a final antidumping order is determined by the order," in affirming the holding that certain portable electronic typewriters with text memory, developed after the final order covering "all portable electronic typewriters," were within the covered class or kind of merchandise and were thus within scope)).  It would be illogical for "class or kind of merchandise" to simultaneously also refer more broadly to products outside of or beyond a certain proceeding.  A product not subject to a proceeding is therefore not of the same class or kind of merchandise as products that are subject to the proceeding, regardless of physical similarities.[20]

---

[20] Orders often specify exclusions.  See, e.g., Issues and Decision Mem. for the Administrative Review of the [ADD] Order on Diamond Sawblades and Parts Thereof from the [PRC], A-579-900, 3 (Jun. 6, 2017), available at http://ia.ita.doc.gov/frn/summary/prc/2017-12106-1.pdf (last visited Jun. 19, 2017); Issues and Decision Mem. for the Final Results and the Partial Rescission of the 2014–2015 [ADD] New Shipper Reviews: Multilayered Wood Flooring from the [PRC], A-570-970, 3 (May 26, 2017), available at http://ia.ita.doc.gov/frn/summary/prc/2017-11560-1.pdf

(footnote continued)

On remand, in response to the court's assumption that it had applied different origin rules to the same class or kind of merchandise, Commerce explained that, pursuant to the statutory framework, the term "class or kind of merchandise" refers to the products covered within a particular proceeding.[21] See Solar II Taiwan Remand Results at 12–23. Commerce stated that the solar products covered by the Solar II PRC Orders therefore are not and could not be within the same class or kind of merchandise as the products covered by the Solar II Taiwan Order:

> the Department did not apply conflicting country-of-origin analyses to a "single" class or kind of merchandise. The Department initiated investigations (Solar I, Solar II PRC, and Taiwan Solar) into three different classes or kinds of merchandise, independently analyzed the country-of-origin of the products at issue in each, and ultimately issued final determinations as to three different classes or kinds of merchandise which, as is reflected in the Orders themselves, cover different products.

---

(last visited Jun. 19, 2017); Issues and Decision Mem. for Certain Cased Pencils from the [PRC]: Final Results of [ADD] Administrative Review; 2014–2015, A-570-827, 2 (May 22, 2017), available at http://ia.ita.doc.gov/frn/summary/prc/2017-11053-1.pdf (last visited Jun. 19, 2017). Since subject merchandise is defined with reference to an order, the fact that there can be an exclusion further supports the understanding that "class or kind of merchandise" cannot refer to a static, predefined type of merchandise.

[21] Commerce also noted that the legislative history also supports an understanding of the phrase "class or kind of merchandise" as subject merchandise. Solar II Taiwan Remand Results at 20. In implementing the Uruguay Round Agreements Act of 1994, Congress modified the Tariff Act of 1930 to render certain statutory provisions consistent with the language of the WTO Antidumping Agreement and Agreement on Subsidies and Countervailing Measures. See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. No. 103-316 (1994). In adopting the term "subject merchandise," Congress explained:

> What formerly was referred to as the "class or kind" of merchandise subject to investigation or covered by an order is now referred to simply as the "subject merchandise." The substitution of terms from the Agreement is not, in itself, intended to affect the meaning ascribed by administrative and judicial interpretation to the replaced terms.

Id. at 4,161.

Solar II Taiwan Remand Results at 17.  Commerce explained that "class or kind of merchandise" does not refer to a "general 'type of product,' not restricted by the merchandise specifically described as within, and limited by, the scope of the AD[D] and CVD orders."  Id. at 37.  According to Commerce, as the Solar II PRC Orders and Solar II Taiwan Order cover products within two distinct classes or kinds of merchandise, the agency did not apply two rules of origin to products within the same class or kind of merchandise.[22]  See id. at 22–23, 27–28.

On remand Commerce has sufficiently explained the basis for the two distinct rules of origin it applied in the Solar II PRC and Solar II Taiwan investigations.  As the harm alleged and ultimately confirmed in the Solar II PRC investigations was specific to solar panels that had been assembled in China, it was reasonable for Commerce to determine that the appropriate country-of-origin for subject merchandise within that investigation was the country of panel assembly.  At the same time, the harm alleged and ultimately confirmed in the Solar II Taiwan investigation was specific to the manufacture of solar cells in Taiwan; it accordingly was reasonable for Commerce to determine that the appropriate country-of-origin for subject merchandise within that investigation was the country of cell manufacture.  The differing rules of origin appear reasonably tailored to cover the particular solar products at issue in the two sets of investigations, and reflect the particular injurious activity discovered in each investigation.  Based on this

---

[22] Commerce also emphasized that the statute allows for an evolution in the class or kind of subject merchandise from the initial investigation to the final order.  Solar II Taiwan Remand Results at 36–37.  Commerce explained that, during the investigation, the "class or kind of merchandise" is governed by the words of the petition; once an order is published, the "class or kind of merchandise" is defined by the language of the order, and accordingly the "class or kind of merchandise" described in the final determination of an investigation may not be "identical to that upon which the Department initiated the investigation."  Id. at 36.

understanding of the term "class or kind of merchandise" as applicable to products within a particular proceeding, the concern expressed by the court that Commerce applied more than one country-of-origin rule to products within the same class or kind of merchandise necessarily dissipates.  The solar panels covered by the <u>Solar II PRC Orders</u> are not within the same class or kind of merchandise as the solar panels covered by the <u>Solar II Taiwan Order</u>.

### B.  Similarly Situated Products

A related but distinct issue is the court's concern in <u>SunPower</u>, incorporated by reference in <u>SunEdison</u>, that Commerce treated similarly situated products differently in the Solar II PRC proceeding than in the Solar II Taiwan proceeding.  <u>See</u> <u>SunEdison</u>, 40 CIT at __, 179 F. Supp. 3d at 1321–22; <u>SunPower</u>, 40 CIT at __, 179 F. Supp. 3d at 1302–07.  In the Solar II PRC investigations, Commerce assessed ADD and CVD liability based on pricing and subsidization behavior in the country of panel assembly and, in the Solar II Taiwan investigation, consistent with prior practice Commerce assessed ADD liability based on pricing behavior in the country of cell manufacture.  <u>SunPower</u>, 40 CIT at __, 179 F. Supp. 3d at 1302–03; <u>see</u> <u>SunEdison</u>, 40 CIT at __, 179 F. Supp. 3d at 1321–22.  The court expressed concern that, in so doing, Commerce "applied two different rules to similarly situated products."  <u>SunPower</u>, 40 CIT at __, 179 F. Supp. 3d at 1303.

On remand, Commerce explained that, due to the particular circumstances present in the Solar II PRC investigations, it sought to investigate different products than in the Solar II Taiwan investigation (<u>i.e.</u>, assembled solar modules, laminates, and/or panels rather than solar cells), and it defined the scope in the Solar II PRC investigations

differently as a result.  See Solar II Taiwan Remand Results at 22–23, 29–30.  Thus, it

reasons that the products covered by the Solar II PRC Orders are not similarly situated

to the products covered by the Solar II Taiwan Order.  Id. at 29–30.  The Solar II PRC

investigations concern assembled panels while the Solar II Taiwan investigation concerns

solar cells.[23]  Commerce explained that it determined in the Solar II PRC investigations

that China subsidizes the panel assemblies and prices panels exported to the U.S. below

the prices at which those products are sold in China.  See id. at 53–54.  Therefore, the

Solar II PRC investigations and orders target panel assemblies while the Solar II Taiwan

(and Solar I PRC) investigations and orders target cells.  Because the Solar II PRC

investigations focused on allegations of injurious dumping activity and subsidization with

respect to assemblies within the PRC,[24] China was the country in which the activities that

---

[23] However, as discussed above, solar cells manufactured in Taiwan and assembled into panels in China are excluded from the scope of the Solar II Taiwan Order, to avoid overlapping coverage as these cells are within the scope of the Solar II PRC Orders.  See Solar II Taiwan Remand Results at 21–22; Solar II Taiwan Order; Solar II PRC Orders.

[24] Specifically, in the Solar II PRC final determinations, Commerce explained that:

In these investigations, the alleged injury to the domestic industry stems from certain solar modules that are assembled in the PRC using cells produced in third countries, modules which are not covered by the scope of Solar I and, thereby, exceed the reach of the remedy afforded by the Solar I AD[D] and CVD orders. In addition, taking the instant PRC investigations together with Solar I, the Petitioner has alleged that the domestic industry is being injured as a result of the unfair pricing of cells produced in the PRC, modules containing such cells, and modules assembled in the PRC with third-country cells, as well as unfair subsidization in the PRC of both cells and modules.

. . .

. . . [T]here exist prior AD[D] and CVD orders on related merchandise (i.e., solar cells and modules) from the PRC – Solar I – and following the initiation of the Solar I investigations and the imposition of those orders, there has been a shift in trade

(footnote continued)

led to the injurious behavior in those investigations occurred. Id. at 29–30.  Commerce

concluded that it was therefore reasonable to focus on the pricing behavior within the

country of assembly, in order to fashion a remedy to address the particular injury alleged.

See id. at 29–31, 47–48, 53–54.  Commerce emphasized that the same circumstances

were not present in the Taiwan investigation, which drove its decision in that investigation

to focus on pricing behaviors within the country of cell manufacture.[25] Id. at 29–30.  Thus,

according to Commerce, this is not an instance of arbitrary disparate treatment of similarly

situated products; on the contrary, the disparate treatment is specific to the disparate

conduct alleged in the petitions and discovered in the investigations, and is targeted in

each proceeding to achieve an effective remedy.  See id.

Commerce provided a reasoned basis for its different approaches in the two

different cases.  As discussed above, Commerce tailored the Solar II PRC investigations

to address injurious pricing decisions for and subsidization of solar panels assembled in

China using non-Chinese cells, and therefore reasonably constructed a country-of-origin

---

flows that has resulted in increased imports of non-subject modules produced in
China.  Such imports – if they are dumped and/or unfairly subsidized and injurious
– should not be beyond the reach of the AD[D] and CVD laws.

Certain Crystalline Silicon Photovoltaic Products from the [PRC]: Issues and Decision Mem. for
the Final Determination of Sales at Less than Fair Value, A-570-010, 13 (Dec. 15, 2014), available
at http://ia.ita.doc.gov/frn/summary/prc/2014-30092-1.pdf (last visited July 14, 2017); Issues and
Decision Mem. for the Final Determination in the [CVD] Investigation of Certain Crystalline Silicon
Photovoltaic Products from the [PRC], C-570-011, 38–39 (Dec. 15, 2014), available at
http://ia.ita.doc.gov/frn/summary/prc/2014-30071-1.pdf (last visited July 14, 2017).

[25] In the Solar II Taiwan investigation, Commerce concluded that, although Taiwanese cell
production was injuring the U.S. industry, there were not similar concerns regarding evasion and
panels assembled in Taiwan as were present in the Solar II PRC investigations.  See Solar II
Taiwan Final Decision Memo at 23.

rule that focused on that panel assembly.[26]   Commerce adequately explained that this deviation from prior practice was due to the circumstances in the Solar II PRC investigations that warranted a unique response in order to fashion a remedy for the injurious pricing behavior alleged and found.   Fashioning remedies based on the unique circumstances present in the Solar II PRC and Solar II Taiwan investigations did not result in disparate treatment of similarly situated products; these products were situated differently, as Taiwanese cells assembled into panels in third countries are not subject to the subsidies and dumping behaviors present in the Chinese market.   Commerce has sufficiently explained the reasons for its disparate treatment of these solar products.  Save Domestic Oil, Inc. v. United States, 357 F.3d 1278, 1283–84 (Fed. Cir. 2004) ("[I]f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom.").

Kyocera argues that Commerce should apply the origin rule that Commerce applied to Taiwanese cells assembled into panels in the PRC, finding those panels to be products of the country of panel assembly rather than of the country of cell manufacture. See Kyocera Remand Comments 5 ("There is no reasonable basis for adopting a second, inconsistent origin analysis that treats modules produced outside of Taiwan (or China) as

---

[26] SunEdison addressed Kyocera's argument that solar products that are further manufactured in a third country may not be included in the scope of the order absent a finding of circumvention pursuant to 19 U.S.C. § 1677j(b).  SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1319–20; see Kyocera 56.2 Br. 11–18.   The court determined that 19 U.S.C. § 1677j(b) "applies to circumstances where an order with a defined scope is already in effect."  SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1319.  Because, here, "Commerce is fashioning the foundational scope of a proceeding, before the imposition of the order, rather than extending an existing order to cover new merchandise so as to address circumvention of an order's pre-existing scope," the court determined that the anticircumvention statute is "inapposite to the specific issues presented."  Id., 40 CIT at __, 179 F. Supp. 3d at 1320.

products of Taiwan absent evidence that pricing decisions for such modules are being made in Taiwan."). However, Commerce's substantial transformation analysis as applied in this case—determining that the location of cell manufacture is origin-conferring—is supported by substantial evidence. SunEdison, 40 CIT at __, F. Supp. 3d at 1322–24 (finding that Kyocera had not presented "a basis to disturb [Commerce's] conclusion that the cell is not substantially transformed in the process of panel assembly so as to change the cell's country-of-origin, pursuant to Commerce's usual substantial transformation test in the antidumping context."). This argument is not revisited here.

## C. Normal Value

The court sought further explanation or reconsideration from Commerce regarding its decision to base duty assessments on the Chinese market in Solar II PRC as compared to its approach in Solar II Taiwan. SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1321–22; SunPower, 40 CIT at __, 179 F. Supp. 3d at 1305–07. The court determined this issue was implicated in the Solar II Taiwan investigation because the exclusion in the Solar II Taiwan scope incorporates the Solar II PRC scope. SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1321–22. The court emphasized that Commerce did not consider whether comparing the Chinese price for the finished product to the U.S. export price constituted a "fair comparison" as required by statute, and that Commerce did not explain its deviation from its past practice of assessing antidumping and countervailing duty liability on the market of essential production. SunPower, 40 CIT at __, 179 F. Supp. 3d at 1305–07; see SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1325–26. The court

remanded for Commerce to explain or reconsider this determination.[27]  SunPower, 40

CIT at __, 179 F. Supp. 3d at 1307; SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1321–

22, 1325–26.

The statute requires that Commerce compare normal value (the price at which the

subject merchandise sells in the country of export (i.e., home market)) and the export

price (the price at which the subject merchandise sells in the U.S.).[28]  19 U.S.C. §§ 1673,

1677b(a).[29]  The statute instructs that, "to achieve a fair comparison" of the normal value

and the export price,[30] normal value of the subject merchandise shall be determined by

"the price at which the foreign like product is first sold . . . for consumption in the exporting

---

[27] SunPower stated that

> Commerce continued to hold, in Solar II Taiwan as in Solar I PRC, with respect to
> all solar cells except those assembled into panels in China, that analyzing the
> market where most of the essential production takes place, i.e., the country of cell-
> production, is more important than basing the AD[D]/CVD analysis and liability on
> the market of the much less significant subsequent assembly step. Commerce
> does not square this circle in its rationale [in Solar II PRC].

SunPower, 40 CIT at __, 179 F. Supp. 3d at 1305.

[28] Pursuant to 19 U.S.C. § 1677b(a), to determine whether subject merchandise is being or is
likely to be sold at less than fair value in the United States, "a fair comparison shall be made
between the export price or constructed export price and normal value."  19 U.S.C. § 1677b(a).

[29] In SunPower, the court noted that "these problematic aspects of Commerce's Solar II PRC
decision affect most directly the agency's AD[D], rather than its CVD, analysis," because the ADD
statute requires Commerce to calculate normal value of the finished product on the basis of a
single foreign market while the CVD statute does not contain a similar requirement.  SunPower,
40 CIT at __, 179 F. Supp. 3d at 1307–08; see 19 U.S.C. § 1671.  The court noted that,
"[n]onetheless, Commerce has consistently held that, as with AD[D] liability, CVD liability must
also be based on a single foreign market's subsidy analysis."  SunPower, 40 CIT at __, 179 F.
Supp. 3d at 1308.

[30] Export price is the price at which the subject merchandise is sold (or agreed to be sold) before
importation by the foreign producer or exporter to an unaffiliated purchaser in the United States
or for exportation to the United States.  19 U.S.C. § 1677a(a).

country. . ."[31]  19 U.S.C. § 1677b(a)(1)(B).  Thus, a fair comparison is achieved when the

price at which the foreign like product is sold in the exporting country is compared to the

price at which the subject merchandise is sold in or to the United States.

The subject merchandise, its physical attributes and its country of origin, is defined

by the scope which is set by Commerce (e.g., widgets from China).  Duferco Steel, Inc.

v. United States, 296 F.3d 1087, 1096–97 (Fed. Cir. 2002).  To say that a product is "from

China" necessarily raises the question of what it means to be "from" a country.  Commerce

often answers this question by using a substantial transformation test with reference to

the merchandise described in the order; but Commerce can answer this question by using

the words of the order or some other analysis.  SunEdison, 40 CIT at __, 179 F. Supp. at

---

[31] "Foreign like product" is defined as:

> merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

> (A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

> (B) Merchandise—

> (i) produced in the same country and by the same person as the subject merchandise,

> (ii) like that merchandise in component material or materials and in the purposes for which used, and

> (iii) approximately equal in commercial value to that merchandise.

> (C) Merchandise—

> (i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,

> (ii) like that merchandise in the purposes for which used, and

> (iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16).

1320 ("Because the plain language of the antidumping statute does not unambiguously prescribe any specific approach to origin determinations, Commerce may exercise reasonable discretion in selecting a reasonable method for such determinations."); see also Duferco Steel, Inc., 296 F.3d at 1097.

The origin established by Commerce, using a reasonable means it chooses, determines the relevant market for the purpose of assessing duty.  The country-of-origin establishes the country by which normal value is determined.  See 19 U.S.C. § 1677b(a)(1)(B).  Where Commerce employs a substantial transformation test, a test that looks to where the most essential manufacturing occurs, the comparison market will be the market where the essential manufacturing occurs.[32]  If Commerce chooses not to apply the substantial transformation test, the relevant market will be a function of the origin rule that Commerce chooses to apply instead.

Commerce explained that the statute does not require a fair comparison based on the country where most of the production occurs, requiring only that a fair comparison be made between normal value and export price.  See Solar II Taiwan Remand Results at 32–33.  Commerce emphasized that, pursuant to the statute, the agency must be able to, "where appropriate, address unfair pricing decisions or unfair subsidization that is taking place in the exporting country where further manufacturing, such as assembly, occurs, notwithstanding that such activities may not necessarily result in a substantial transformation of merchandise."  Solar II Taiwan Final Decision Memo at 22 (quoting

---

[32] Commerce's essential production test is derivative of the substantial transformation test, in which Commerce considers, inter alia, whether the essential component of the merchandise is substantially transformed in the country of exportation.  See, e.g., Solar II Taiwan Final Decision Memo at 18–19.

Certain Crystalline Silicon Photovoltaic Products from the [PRC]: Issues and Decision

Mem. for the Final Determination of Sales at Less than Fair Value, A-570-010, 15 (Dec.

15, 2014), available at http://ia.ita.doc.gov/frn/summary/prc/2014-30092-1.pdf (last

visited July 14, 2017); Issues and Decision Mem. for the Final Determination in the [CVD]

Investigation of Certain Crystalline Silicon Photovoltaic Products from the [PRC], C-570-

011, 41 (Dec. 15, 2014), available at http://ia.ita.doc.gov/frn/summary/prc/2014-30071-

1.pdf (last visited July 14, 2017)).   Reasonably discernible from Commerce's explanation

is that the proper market for normal value is not necessarily the market where most of the

production occurs.[33]   Rather, the proper market for normal value is the market of origin

as determined by Commerce's origin test in any given situation.   As discussed above, in

the Solar II PRC investigations, because the petitions alleged dumping and subsidization

activities during panel assembly within the PRC, and because Commerce found that

panels assembled in China using non-Chinese solar cells were being subsidized in China

and dumped in the United States, Commerce applied a country of origin rule based on

the country of panel assembly.   See Solar II Taiwan Remand Results at 24–27.

Commerce explained that this focus on China as the location of "qualitatively" significant

production activity caused the agency to agency to base normal value on the Chinese

---

[33] It is reasonably discernible that Commerce's objective in choosing an origin test is to determine the country of export for purposes of ascertaining normal value.   It is also reasonably discernable that Commerce believes the substantial transformation test adequately identifies the relevant market for normal value when the objectionable pricing decisions relate to a particular component. The test identifies where that origin-conferring component was last transformed and the country of export/home market will be where that component last underwent a substantial transformation. However, when the objectionable pricing activities relate to a finished product, i.e., an assembled solar module, the substantial transformation test may not capture all the objectionable activities.

market, "without regard to where the majority of production may have taken place." See id. at 30–33.

Commerce has sufficiently explained why its methodology for determining normal value is different in the Solar II PRC and Solar II Taiwan investigations.  For each order, Commerce must identify the home market for the purpose of determining normal value. The statute does not require Commerce to base normal value on the country of essential production.  While Commerce looks to the country of essential production in the Solar II Taiwan investigation, Commerce may deviate from prior practice as long as it explains why doing so is justified under the circumstances.  Save Domestic Oil, Inc., 357 F.3d at 1283–84 ("[I]f Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom.").   In the Solar II PRC investigations, the subject merchandise is solar modules, laminates, and/or panels assembled in the PRC, which are exported to the United States from China.  Pursuant to the statute, Commerce must compare the price at which the foreign like product is sold in the home market to the price at which the imported solar panels are sold in the United States.   Commerce did this in the Solar II PRC investigations, and its assessment of antidumping duties based on normal value in China was therefore reasonable.  There is no claim here that Commerce's choice to use Taiwan as the home market for the purpose of normal value in the Solar II Taiwan investigation is problematic.[34]

---

[34] Although Kyocera does not challenge Commerce's choice to use Taiwan as the home market for the purpose of normal value in the Solar II Taiwan investigation, Kyocera argues on remand that the differing origin rules in the Solar II PRC Orders and the Solar II Taiwan Order "results in

(footnote continued)

## D.  Duties on the Full Value of the Panel

SunEdison remanded on the issue of assessing antidumping duties based on the

full value of solar panels assembled in a third country from Taiwanese cells.  SunEdison,

40 CIT at __, 179 F. Supp. 3d at 1324–27.  In addition to the apparent inconsistency

between the approaches used in the Solar II PRC and Solar II Taiwan investigations,[35]

the court reasoned that explanation here was necessary because, by its exclusion of

Taiwanese cells assembled into panels in China, the Solar II Taiwan Order incorporated

the Solar II PRC Orders.  Id., 40 CIT at __, 179 F. Supp. 3d at 1325–27.

On remand, Commerce explained that, with respect to assessment of CVD duties,

the duties are based upon the amount of the subsidy provided and thus the subsidization

rates "reflect a percentage of the respondent's relevant sales values, regardless of the

degree of production or value added that occurred in the PRC."  Solar II Taiwan Remand

---

the arbitrary application of the antidumping law in a manner that is not supported by the factual record and is inconsistent with the Department's avowed policy of applying antidumping remedies to exports from the country where the pricing decisions are made."  Kyocera Remand Comments 5.  The court has determined, for the reasons discussed above, that Commerce reasonably explained the application of two different origin rules in these sets of investigations.  Further, as discussed above, Commerce's substantial transformation analysis as applied in this case— determining that the location of cell manufacture is origin-conferring—is supported by substantial evidence.  SunEdison, 40 CIT at __, F. Supp. 3d at 1322–24 (finding that Kyocera had not presented "a basis to disturb [Commerce's] conclusion that the cell is not substantially transformed in the process of panel assembly so as to change the cell's country-of-origin, pursuant to Commerce's usual substantial transformation test in the antidumping context.").  This argument is not revisited here.

[35] The court found that, in the Solar II Taiwan investigation, Commerce reasonably determined to assess antidumping duties on the full value of the solar panels assembled in Mexico using the normal value of foreign like products from Taiwan, "because it is undisputed that at least fifty percent of the production costs of Plaintiffs' solar panels were incurred in the production of the panels' constituent cells in Taiwan."  SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1325.  This approach differed from the approach used in the Solar II PRC investigation, which was based on a comparison to normal values calculated for China, rather than for the market where most of the production of the panels (i.e., cell production) occurred.  Id., 40 CIT at __, 179 F. Supp. 3d at 1326.

Results at 31.  With respect to assessment of ADD duties, Commerce explained that its

comparison of normal value to export value necessarily is a comparison of the finished

product:

> [Commerce] determined the extent of that unfair pricing by comparing the
> [normal value] of the finished, assembled panel to the [US price] for a
> finished, assembled panel from the PRC. With this focus in mind, the
> Department appropriately does not necessarily focus on the cost to the cell
> producer outside of the PRC, because the relevant consideration here was
> the [normal value] of the finished, assembled panel produced by the
> Chinese company.

Id. at 32. The court cannot say that this explanation is unreasonable.   Commerce's

determination to assess duties based upon the full value of the subject merchandise in

Solar II PRC and Solar II Taiwan is reasonable because it remedies illegal subsidization

or pricing decisions relating to the finished product.

## II.  Deferred Issues

SunEdison deferred decision on whether Commerce: (i) "unlawfully altered the

sales databases relied on throughout the investigation," SunEdison, 40 CIT at __, 179 F.

Supp. 3d at 1317–18, and (ii) deprived Kyocera and other third-country producers of a

right to participate as respondents in the investigation.  Id., 40 CIT at __, 179 F. Supp. 3d

at 1317.

### A.  The Effect of Altering the Scope during the Investigation

SunEdison deferred decision on whether Commerce's alteration of the scope

language in the final determination unlawfully resulted in different sales included in the

final order than were used to determine dumping liability.  SunEdison, 40 CIT at __, 179

F. Supp. 3d at 1317–18.  Commerce has the authority to modify the scope language until

the final order is issued, and thus the authority to capture different sales in the scope of

the final order than were included earlier in the proceedings. Therefore, Kyocera's argument to the contrary fails and Commerce's determination on this issue is sustained.

The final order determines the merchandise that is within scope. <u>See</u> <u>Duferco Steel, Inc.</u>, 296 F.3d at 1096. Commerce has the authority to initially determine the scope of the investigation, as well as the authority to modify the scope language until the final order is issued, based on the agency's findings during the course of the investigation. <u>Id.</u> ("Commerce's final determination reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order."); <u>Mitsubishi Electric Corp. v. United States</u>, 898 F.2d 1577, 1582 (Fed. Cir. 1990) (Commerce has "[t]he responsibility to determine the proper scope of the investigation and of the antidumping order. . . ."). Commerce "has inherent power to establish the parameters of the investigation" throughout the proceedings, "so that it would not be tied to an initial scope definition that may not make sense in light of the information subsequently obtained in the investigation." <u>Duferco Steel, Inc.</u>, 296 F.3d at 1089 (internal quotations and citations omitted). Commerce's authority to determine the scope of the final order is in service of "best effectuat[ing] the purpose of the antidumping laws and the violation found." <u>Mitsubishi Electric Corp.</u>, 898 F.2d at 1583.

Here, Commerce determined during the course of the investigation that the scope as written in the petition, initiation notice, and preliminary determination required clarification to ensure that the order would be administrable and would cover the intended products. <u>See</u> Scope Revision Notice Letter at 1–2. Accordingly, Commerce adjusted the scope in the final determination, <u>see</u> Solar II Taiwan Final Decision Memo at 4–5, and ultimately the final order, <u>see</u> <u>Solar II Taiwan Order</u>, 80 Fed. Reg. at 8,596, which

necessarily brought certain sales within that final order that were not explicitly included during previous stages of the proceeding. Doing so was not contrary to law, as Commerce has the authority to modify the scope language until the final determination based on information gathered during the investigation. See Duferco Steel, Inc., 296 F.3d at 1089, 1096. It is reasonable to assume that, if the scope is adjusted, certain sales not explicitly included in earlier stages of the proceedings will ultimately be included within the final order.

### B. The Right to Participate in the Investigation

SunEdison also deferred consideration of Kyocera's claim that the change in scope language from the outset of the investigation to the final determination deprived it of the opportunity to participate in the investigation and to be a respondent, and therefore of the opportunity to submit information demonstrating that it was not dumping solar products. SunEdison, 40 CIT at __, 179 F. Supp. 3d at 1317. Kyocera argues that, because modules assembled in third countries were not explicitly included within the scope of the order at the outset of the proceedings, it "was not notified by the Department of the pending investigation or served with Department questionnaires that would have enabled Kyocera to participate in the investigation during the early information gathering stage of the investigation." Kyocera 56.2 Br. 24. Kyocera alleges that the alteration of the scope in the final determination deprived the company of the right to participate in the proceedings and to submit factual information. Id. at 24–25. Kyocera's argument is without merit.

As discussed above, Commerce may alter the scope of the investigation until the final order. See, e.g., Duferco Steel, Inc., 296 F.3d at 1089, 1096. Here, Commerce acted within its authority to alter the scope of the investigation prior to the final order.

Doing so brought Kyocera's panels assembled in Mexico from Taiwanese solar cells explicitly within the scope of the order.  Solar II Taiwan Final Decision Memo at 23–24. Given Commerce's authority to alter the scope, this result is not unreasonable.

Kyocera's argument that it was not given notice of and was deprived of a right to participate in the investigation is without merit.  First, Commerce's authority to alter the scope until the final order necessarily implies that some parties covered by the final order may not be able to submit factual information at the early stages of the proceedings.  As discussed above, Commerce's authority to alter the scope necessarily includes the authority to bring parties within the final order who were not within scope earlier in the case.  See Duferco Steel, Inc., 296 F.3d at 1089, 1096.  The court need not reach whether it is always reasonable for parties to be brought into proceedings after the investigation has commenced because Commerce has modified the scope.  But, here, it is evident that Kyocera was on notice of the proceedings and was heard in the course of the investigation prior to the final determination.[36]  On September 15, 2014, Kyocera requested Commerce to clarify the scope of the investigation.  Certain Crystalline Silicon Photovoltaic Products from Taiwan: Request for Scope Determination re Solar Products from Mexico, PD 337, bar code 3228306-01 (Sept. 15, 2014).  Kyocera then submitted a case brief in response

---

[36] Defendant emphasizes that, throughout this investigation, Commerce put interested parties on notice that the scope may be clarified or revised.  Specifically, Commerce stated in the initiation notice that it was "'setting aside a period for interested parties to raise issues regarding product coverage' and that Commerce's intent was that its decisions on product coverage would be informed by its previous decision in Solar I."  Def.'s Resp. Opp'n Pls.' Rule 56.2 Mots. J. Agency R. 39, Mar. 11, 2016, ECF No. 45 ("Def.'s Resp.") (quoting Solar II Taiwan Initiation Notice, 79 Fed. Reg. at 4,662).  Defendant also emphasizes that, in the preliminary determination, Commerce stated that its intention to "'continu[e] to analyze interested parties' scope comments.'" Def.'s Resp. 39 (quoting Decision Mem. for the Prelim. Determination in the [ADD] Investigation, A-583-853, 5 (July 24, 2014)).  Finally, Defendant highlights Commerce's October 3, 2014 Scope Revision Notice Letter, in which Commerce notified interested parties of a proposed revision of the scope language.  See Def.'s Resp. 40 (citing Scope Revision Notice Letter at 1–2).

to Commerce's October 3 Scope Revision Notice Letter notifying interested parties of a

proposed scope clarification, <u>see</u> Certain Crystalline Silicon Photovoltaic Products from

Taiwan: Case Brief, PD 361, bar code 3235607-01 (Oct. 16, 2014), and subsequently

submitted a rebuttal brief as well.  <u>See</u> Certain Crystalline Silicon Photovoltaic Products

from Taiwan: Rebuttal Brief, PD 380, bar code 3237704-01 (Oct. 27, 2014).   Although

Kyocera's case and rebuttal briefs focused only on issues related to scope, the case and

rebuttal briefs were Kyocera's opportunity to be heard on any issues it deemed relevant

to its position.  <u>See</u> 19 C.F.R. § 351.309(c)(1)–(2) (2014) ("The case brief must present

all arguments that continue in the submitter's view to be relevant to [Commerce's] final

determination or final results. . . .").   Commerce acknowledged and responded to the

arguments Kyocera raised in its case and rebuttal briefs.  <u>See</u> Solar II Taiwan Final

Decision Memo at 15–25.   Kyocera's participation in the investigation prior to the final

determination demonstrates that it was on notice of and was heard during the

investigation.[37]   Kyocera points to no place in the record demonstrating that it tried to

---

[37] Kyocera's reliance on <u>Smith Corona Corp. v. United States</u>, 16 CIT 562, 796 F. Supp. 1532 (1992), to support its position that Commerce deprived it of a right to participate in the proceedings by clarifying the scope in the final determination is misplaced. <u>See</u> Kyocera 56.2 Br. 24–25. <u>Smith Corona</u> is not instructive here, as it presented facts which differed significantly from those in the instant case.  In the investigation at issue in <u>Smith Corona</u>, after issuance of the preliminary determination, petitioner requested that Commerce modify the scope of the order to include parts which had been previously excluded from the scope. <u>Smith Corona</u>, 16 CIT at 563–64, 796 F. Supp. at 1533–34.  Commerce declined to modify the scope, finding the request "vague and untimely" and the allegations of increase in imports unsupported. <u>Id.</u>, 16 CIT at 564, 796 F. Supp. at 1534.  In sustaining Commerce's decision not to modify the scope, the <u>Smith Corona</u> court found it significant that scope had not previously been at issue in the investigation and the products that petitioner sought to include had been specifically excluded earlier in the investigation. <u>Id.</u>, 16 CIT at 564–65, 796 F. Supp. at 1534.  The court nonetheless acknowledged Commerce's authority to modify the scope of an investigation prior to the final order, <u>id.</u>, 16 CIT at 565–66, 796 F. Supp. at 1534–35, and distinguished the case "from the numerous cases wherein Commerce has exercised its discretion to clarify the scope of orders which were ambiguous when issued or which became ambiguous due to the introduction of new technology into the market." <u>Id.</u>, 16 CIT at 564, 796 F. Supp. at 1534.

submit information that was rejected or to participate in the investigation in some other way and was prevented from doing so. Kyocera's submissions focused only on issues related to scope.

Further, the statutory and regulatory scheme do not guarantee the right to participate in an investigation as a respondent. To the contrary, the statute indicates that respondent selection is within Commerce's discretion. See 19 U.S.C. §§ 1677f-1(c)(2)(A)–(B). Commerce explained that, per the statute, "[a] respondent selection determination must be based on information that is known and available at the time of selection," notwithstanding changes to the scope or information gained during the course of the investigation. Solar II Taiwan Final Decision Memo at 28; see 19 U.S.C. §§ 1677f-1(c)(2)(A)–(B). As Defendant emphasizes, there is no indication in the statute that the selection process is to evolve as the proceedings and scope evolve. See Def.'s Resp. Opp'n Pls.' Rule 56.2 Mots. J. Agency R. 64–66, Mar. 11, 2016, ECF No. 45. The opposite is suggested by the limiting phrases "based on information available to [Commerce] at the time of selection" and "that can be reasonably examined." See 19 U.S.C. §§ 1677f-1(c)(2)(A)–(B). Kyocera points to no statutory or regulatory authority that contradicts Commerce's position. Accordingly, it cannot reasonably be said that a party ultimately covered by the scope of a final order has a right to participate as a respondent in an investigation or to submit factual information throughout the investigation. Therefore, Kyocera's argument that it was deprived of such a right necessarily fails.

## CONCLUSION

For the foregoing reasons, the remand determination in the antidumping duty investigation of certain crystalline silicon photovoltaic products from Taiwan complies with

the court's order in <u>SunEdison</u>, 40 CIT at __, 179 F. Supp. 3d at 1327, and the conclusions

are supported by substantial evidence and in accordance with law.   Judgment will enter

accordingly.

 /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: July 21, 2017
       New York, New York